

USA

KLIMAVICIUS

DB
3:95-CR-01421
*207*
*CRMEMSUP.*

1  JUANITA R. BROOKS (CSB #075934)
   LISA J. DAMIANI (CSB #137968)
2  JOHN DILLON CLARKE (CSB #159353)
   McKENNA & CUNEO, L.L.P.
3  750 B Street, Suite 3200
   San Diego, California 92101
4  (619) 595-5400

5  Attorneys for Defendant,
   RICHARD KLIMAVICIUS-VILORIA (1)



6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  (HONORABLE MARILYN L. HUFF)

11

12
   UNITED STATES OF AMERICA,        CASE NO. 95-1421
13
              Plaintiff,            MEMORANDUM OF POINTS AND
14                                  AUTHORITIES IN SUPPORT OF
          v.                        MOTIONS FOR MISTRIAL AND/OR
15                                  AN EVIDENTIARY HEARING, OR, IN
   RICHARD KLIMAVICIUS-VILORIA      THE ALTERNATIVE, A NEW TRIAL
16 (1), et al.,
                                    Date:   July 29, 1996
17            Defendants.           Time:   9:00 a.m.

18

19

20

21

22

23

24

25

26

27

207                              ORIGINAL

# TABLE OF CONTENTS

Page

I.    FACTS ...................................................................................................... 1

II.   ARGUMENT ............................................................................................ 4

    A.   THE GOVERNMENT'S STATEMENTS TO THE
        PRESS DURING DELIBERATIONS DENIED THE
        DEFENDANTS A FAIR TRIAL ...................................................... 4

        1.   The Prosecution Made Prejudicial Statements To
            The Press While The Jurors Were Deliberating ................... 5

        2.   The DEA Was Heavily Involved Throughout The
            Case ....................................................................................... 6

        3.   The Prosecution's Prejudicial Comments Were
            Prominently Displayed In The Local Newspaper ................. 8

        4.   The Prosecution's Statements To The Press Were
            Plainly Prejudicial ............................................................... 8

        5.   At a Minimum This Court Must Conduct and
            Evidentiary Hearing ............................................................ 9

    B.   The Introduction of Extraneous Information During
        Juror Deliberations Denied the defendants a Fair Trial .............. 10

        1.   At a Minimum, There Is A Reasonable Possibility
            That The Article Affected The Verdict ................................ 10

        2.   The Jurors' Exposure To The Article Was Not
            Harmless Error ..................................................................... 12

        3.   The Court Erred In Not Conducting An
            Evidentiary Hearing Upon Learning Of A
            Possible Incident Of Juror Misconduct ................................ 14

III.  CONCLUSION ......................................................................................... 16

### Cases

Bayramoglu v. Estelle, 806 F.2d 880 (9th Cir. 1986) ...............................12

Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991) .........................................4

Henslee v. United States, 246 F.2d 190 (5th Cir. 1957) ..........................15

Hughes v. Borg, 898 F.2d 695 (9th Cir. 1990) ..........................................10

Mattox v. United States, 146 U.S. 140 (1892) .........................................14

McDonald v. Doe, 650 F. Supp. 858 (S.D.N.Y. 1986) ................................4

United States v. Bagnariol, 665 F.2d 877 (9th Cir. 1981), cert. denied,
      456 U.S. 962 (1982) ...................................................................10, 14

United States v. Barragan-Cepeda, 29 F.3d 1378, 1380 (9th Cir. 1994) ................15

United States v. Butler, 567 F.2d 885 (9th Cir. 1978) ..........................5, 7

United States v. Caro-Quintero, 769 F. Supp. 1564 (C.D.Cal 1991) ...........10, 12, 16

United States v. Coast of Maine Lobster Co., 538 F.2d 899
      (1st Cir. 1976) .........................................................................5, 6, 8

United States v. DeCruz, 82 F.3d 856, 868 (9th Cir. 1996)........................6

United States v. Enriquez-Estrada, 999 F.2d 1355 (9th Cir. 1993).........................6

United States v. Griek, 920 F.2d 840 (11th Cir. 1991)...............................15

United States v. Hernandez-Escarsa, 886 F.2d 1560 (9th Cir. 1989),
      cert. denied, 497 U.S. 1003 (1990) ...................................................15

United States v. McKoy, 771 F.2d 1207 (9th Cir. 1985)............................5

United States v. McNeill, 728 F.2d 5 (1st Cir. 1984).............................5, 8

United States v. Singer, 785 F.2d 228 (8th Cir. 1986),
      cert. denied, 107 S. Ct. 273 (1986) ....................................................5

United States v. Tanner, 483 U.S. 107 (1987) .........................................15

United States v. Vasquez, 597 F.2d 192 (9th Cir. 1979) ....................14, 15

### Statutes

Fed. R. Evid. 606(b) .........................................................................14

Defendant, RICHARD KLIMAVICIUS-VILORIA, respectfully submits this memorandum in support of his Motions for a Mistrial Based on Government Misconduct and/or an Evidentiary Hearing or, in the alternative, a New Trial.

## I.

## FACTS

On July 25, 1995, U.S. Coast Guard personnel boarded the NATALY I with the permission of Mr. KLIMAVICIUS, the master of the vessel. Over the next two days, the Coast Guard personnel, supplemented by Navy engineers, thoroughly searched the NATALY I. The search of the NATALY was done with the permission of Mr. KLIMAVICIUS and the full cooperation of both him and his crew. On the afternoon of July 27, 1995, cocaine was discovered in fuel tanks on both the port and starboard sides of the NATALY I. Mr. KLIMAVICIUS and the entire crew were immediately placed under arrest.

On July 28, 1995, a Navy ship took the NATALY I in tow and began to proceed north towards Panama. It took nearly three weeks for the government to transport the NATALY I and its crew to San Diego. Almost immediately upon arrival of the NATALY I and its crew in San Diego, the United States Attorney Alan Bersin held a press conference announcing the purported largest seizure of cocaine on the high seas in history. While newspapers covered the press conference, there were no other subsequent articles regarding the seizure, the NATALY I, or the defendants.

On August 31, 1995, Mr. KLIMAVICIUS and his nine codefendants were charged in a two-count indictment with conspiracy and possession with intent to distribute on board the fishing vessel NATALY I. During the discovery phase of the case, the prosecution provided the defendants with relevant documentation, including numerous reports from the Drug Enforcement Agency ("DEA"), many of which concerned the history of the NATALY I and its captains and crew members.

Many of the DEA reports bore the name Kyle Scott. In the week prior to beginning the trial, the government submitted a trial memorandum. The trial memorandum disclosed the government's expected witnesses. Included among the prosecution's witnesses were three DEA agents: Kyle Scott, Sallie Casto, and Maura Gaffney.

On April 9, 1996, the trial of Mr. KLIMAVICIUS and his codefendants began. During the trial, DEA agent Casto testified for the prosecution. Closing arguments were completed on April 19, 1996 and the jury began their deliberations around noon that day. Unable to reach a verdict by the end of the afternoon, the trial court released the jurors and instructed them to return at 8:30 a.m. on Monday, April 22, 1996, to resume deliberating.

Unlike every other day of trial, the jurors were not brought into court before being excused. Therefore, it can only be assumed they were not admonished by the Court not to read any articles regarding the case.

On Sunday, April 21, 1996, the only major newspaper in San Diego, the San Diego Union-Tribune ran an article entitled: **"Columbian held in wake of '95 drug haul with San Diego link."** The first paragraph of the article (which was authored by Arthur Golden) noted that only the crew had been arrested when the Navy and Coast seized a record twelve tons of cocaine aboard a Panamanian fishing vessel last summer. The article went on state that "after information developed by authorities in San Diego," the Panamanian government had arrested the alleged owner of the boat, Jose Castrillon, "on charges of running an international drug smuggling operation for the Cali cartel. The article described the "episode that led to Castrillon's arrest " as having begun with the seizure of the NATALY I and its crew. The trial of the 10 crewmen, the article specifically noted, "wound up Friday when a federal jury began its deliberations."

The article stated that Errol Chavez, special agent in charge of the DEA in San Diego, disclosed that information developed in San Diego played a major role

2

in the arrest of Castrillon. Agent Chavez was quoted as stating: "The ultimate goal of our efforts was to have [Castrillon] arrested and to tie him directly in with that seizure. The evidence strongly indicates he is responsible for [the NATALY I] load." The article also stated that Agent Chavez said intelligence on Castrillon gleaned by the DEA in San Diego was shared with Panamanian law enforcement officials before Castrillon's arrest. Finally, the article stated that "Chavez said he had not been involved in the interrogation of the 10 crew members of the NATALY 1 and could not say whether they had shed much light on Castrillon."

On Monday, prior to the jurors resuming deliberations, the prosecution requested the Court examine the jurors on the record regarding whether they had read or seen the article over the weekend. The prosecution disclosed that on Friday afternoon it had received a telephone call from the reporter Mr. Golden and been questioned regarding Castrillon's arrest. The prosecution stated that it had refused to make any comment to the reporter because the jury was deliberating.

Defense counsel immediately moved for mistrial based on government misconduct. The Government responded by arguing that although it would have been more prudent for Agent Chavez to have declined to talk to Mr. Golden, his actions were not intended to prejudice the case. AUSA Gallo stated that he had spoken with Agent Chavez and Agent Chavez had told Mr. Gallo he was completely misquoted in the article. Chavez, through Gallo, denied ever linking Jose Castrillon with the NATALY I. The defense then requested the Court order Agent Chavez to appear and be placed under oath. This, the Court denied. The Court also denied the motion for mistrial and the government's request to have the jurors' individually examined on the record. Instead, the Court assembled the jurors and, in the presence of counsel and all defendants, reinstructed the jurors regarding their obligation to consider only evidence presented at trial. The jurors then resumed deliberations.

In the late morning of Tuesday, April 23, 1996, the jurors returned guilty verdicts on both counts against Mr. Klimavicius and his codefendant, Lerma-Lerma. The jurors also returned guilty verdicts against the other eight defendants on the possession with intent to distribute charge and was hung on the conspiracy charge.

After the jurors were polled regarding their verdicts, the Court asked how many jurors had seen the San Diego Union-Tribune article over the weekend. Six of the twelve jurors raised their hands indicating that they had seen the article. Two of the six jurors claimed to have seen but not read the article, while four admitted to having read the entire article. A seventh juror said she had neither seen nor read the article, but knew about the article because it was discussed in the jury room during deliberations.

The Court then asked each juror who admitted reading the article whether the article influenced their verdict **or** whether they obeyed the Court's instructions and based their verdict only on the evidence presented in court. In response to the Court's questioning, each juror claimed that the article had not influenced their deliberations. The defense objected to the Court's continued questioning of the jurors in this fashion. The leading and suggestive nature or the questions would not illicit the truth, but rather telegraph to the jurors the "right" answers. The defense then renewed the motion for mistrial. The motion was once again denied.

## II.

## ARGUMENT

A. THE GOVERNMENT'S STATEMENTS TO THE PRESS DURING DELIBERATIONS DENIED THE DEFENDANTS A FAIR TRIAL

A prosecutor has a duty to ensure a fair trial and to obtain a fair conviction. Brown v. Borg, 951 F.2d 1011 (9th Cir. 1991) (writ of habeas corpus granted where prosecutor knowingly introduced and relied on false evidence). As public servants, prosecutors are held to a higher standard than private advocates. McDonald v.

Doe, 650 F.Supp. 858 (S.D.N.Y. 1986) (court recognizes powers of prosecutor require enhanced responsibilities). It is well established that the prosecution has a duty **not** to engage in behavior that will affect the jury's ability to judge the evidence fairly. United States v. McKoy 771 F.2d 1207, 1212 (9th Cir. 1985). As one federal judge has noted, "the interest of the prosecution is not that it shall win the case, but that . . . justice shall be done". United States v. Butler, 567 F.2d 885, 893 (9th Cir. 1978) (Ely, J., concurring).

Courts have made clear that, no matter when it occurs, speaking to the press regarding the merits of a case constitutes prosecutorial misconduct, if the defendant's right to a fair trial is impaired. E.g., (United States v. McNeill, 728 F.2d 5 (1st Cir. 1984) (prosecution spoke to press regarding merits of the case right before beginning trial); United States v. Coast of Maine Lobster Co., 538 F.2d 899 (1st Cir. 1976) (prosecution spoke to press regarding merits of the case during deliberations). It also is improper for the prosecution to leak unproven allegations to the press. See United States v. Singer, 785 F.2d 228 (8th Cir. 1986), *cert. denied*, 107 S.Ct. 273 (1986).

If prosecutorial misconduct occurs, a mistrial must be granted unless the prosecution shows that it was harmless beyond a reasonable doubt. 771 F.2d at 1212. In Coast of Maine Lobster, the court used the following factors to assess the harm caused by a prosecutor's statements to the press while the jury was deliberating: (1) the timing of the public statement; (2) the relationship of the prosecutor to the criminal trial; (3) the prominence of the statement; and (4) the relationship of the published views to the issues in the case. 538 F.2d at 902.

1.  The Prosecution Made Prejudicial Statements To The Press While The Jurors Were Deliberating

Prosecutorial statements to the press must be timed not to interfere with the fair trial rights of the defendant. Coast of Maine, 538 F.2d at 904. In Coast of Maine, the prosecutor appeared on a television show that aired the day before the

5

jury was to enter deliberations. The next day, a widely read local paper carried a story quoting him as saying the judge in the case gave too lenient sentences. The First Circuit granted the defendant a new trial based on the prosecutor's statement. The Coast of Maine court noted that prosecutors' public statements during a trial receive a much higher level of scrutiny than statements made by a government official not associated with the trial. 538 F.2d at 902.

In the instant case, on the Friday afternoon the jurors began deliberating, a San Diego Tribune reporter contacted the prosecution to ask for comments on the arrest of Jose Castrillon, a known drug smuggler and alleged owner of the NATALY I. Castrillon's arrest had occurred two weeks before. Although the prosecution declined to comment, for some reason, the prosecution failed to inform the local DEA office not to speak to the press, although it had been intimately involved in the case. When asked in court why they neglected to tell the DEA agent not to speak to the press, the prosecution responded that it just hadn't occurred to them. The newspaper reporter apparently contacted Errol Chavez, special agent in charge of the San Diego DEA office, who provided information and was quoted in an article published in the Sunday edition.

The jurors began deliberating on Friday afternoon. Jurors ready to vote not guilty on Friday could have changed their mind after seeing the article on Sunday. That the deliberations continued into Monday indicates some jurors were not convinced of the defendants' guilt. The timing of Agent Chavez' statements could not have been more critical.

2.    The DEA Was Heavily Involved Throughout The Case

Government personnel involved with an ongoing prosecution are under an obligation to take exceptional steps to avoid prejudicing it. Id at 902. The Ninth Circuit has made clear that the fair trial rights of a defendant cannot be impaired by the conduct of any government official or agent closely involved with a case. For example, in United States v. Enriquez-Estrada, 999 F.2d 1355 (9th Cir. 1993), the

court found that the prejudicial testimony of a DEA agent constituted prosecutorial misconduct. More recently, in United States v. DeCruz, 82 F.3d 856, 868 (9th Cir. 1996), the court defined the term "prosecutorial misconduct" to encompass the "actions of government agents for which the prosecution must account". In DeCruz, an Immigration and Naturalization Service special agent contacted the defendant's cousin to inform him that the prosecution did not believe the defendant's attorney was properly conveying plea offers. The court considered the actions of the INS agent to be prosecutorial misconduct.

Agent Errol Chavez is in charge of the San Diego DEA office. The DEA played a central role in the arrest and prosecution of Mr. KLIMAVICIUS and his codefendants. DEA intelligence apparently was used by the U.S. Coast Guard to identify and locate the NATALY I, as reflected in DEA reports provided in discovery. Additionally, three DEA agents were identified as government witnesses and one agent, Ms. Sallie Casto, was a crucial prosecution witness at trial who had the role of helping to put the case against the defendants together. Further, defense counsel recently learned that the DEA and, in particular, Agent Kyle Scott, interviewed relatives of one of the defendants in Texas. Undoubtedly, the San Diego DEA office, which Agent Chavez supervises, conducted other investigations on behalf of the prosecution in this case. This case involved the largest seizure of cocaine on the high seas in United States history. It is nonsensical to suggest that the DEA was not an integral part of the prosecution team.

In Butler, investigative agents working with the prosecution made false promises of leniency to the defendants. 567 F.2d at 891. The court found that "since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure". Id at 891(quoting Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964)). In the minds of the jurors who read the article, it probably made little difference that it was a DEA

7

1 agent and not a prosecutor who was making incriminating statements regarding
2 the case.

3      As a high-ranking official in the DEA, Chavez was seen as one with a
4 knowledgeable viewpoint on this case, and on criminal drug activity in general.
5 Further, it is unreasonable to suggest that misconduct by a prosecutor is allowable
6 when committed by another government agent. If that were the case, a prosecutor
7 would be able to prejudice the jury by having other government agents speak to the
8 press although he would be legally bound from doing so.

9      3.    The Prosecution's Prejudicial Comments Were Prominently Displayed
10              In The Local Newspaper

11      The comments by Agent Chavez were published in the Sunday edition of San
12 Diego's only major newspaper. The article was prominently placed on the back
13 page of the newspaper's front section. Most people who even scanned the
14 newspaper could not help but see the article because of its location. This is
15 demonstrated by the fact that six jurors admitted to having seen the article.

16      4.    The Prosecution's Statements To The Press Were Plainly Prejudicial
17      To be prejudicial, prosecutorial misconduct must go to a material aspect of
18 the case. Inflammatory statements to the press about the substance of a case are
19 clearly prejudicial. McNeill, 728 F.2d at 9. However, as the court in Coast of
20 Maine pointed out, "the nexus between the views as published and the issues in the
21 pending trial must be close enough so that a reasonable person could see an
22 obvious connection". 538 F.2d at 902. In the instant case, Agent Chavez was
23 quoted as saying: "The ultimate goal of our efforts was to have [Castrillon] arrested
24 and to tie him in directly with that seizure [of the NATALY I]. The evidence
25 strongly indicates he is responsible for that load". The article states that Agent
26 Chavez said that "information developed in San Diego played a major role in the
27 arrest of Castrillon." The article also discloses that Mr. KLIMAVICIUS and his
28 codefendants were interrogated: "Chavez said he had not been involved in the

interrogation of the 10 crew members of the NATALY I, and could not say whether they had shed much light on Castrillon".

There was no evidence presented at trial that Mr. KLIMAVICIUS or any of his codefendants had been interrogated. Thus, before reading this article, the jurors did not know that the defendants had been interrogated. Agent Chavez' statements, however, disclose not only that the defendants were interrogated, but that information developed in San Diego led to the arrest of Castrillon. The logical conclusion (and one Agent Chavez must have known would be made) is that the defendants' interrogations led to the arrest of Castrillon. The article's statement that Chavez could not say whether the defendants had shed "much" light on Castrillon clearly implies that the defendants had at least shed **some** light on him, thus reinforcing the idea that the defendants were involved in Castrillon's illegal activities. Agent Chavez' statements about this case outside the courtroom, where the defendants could not exercise their right to confrontation, was grossly improper and severely impaired their fair trial rights. As demonstrated above, the misconduct of the prosecution in making statements to the press that would unquestionably affect the ability of the jurors to judge the defendants fairly requires a mistrial.

>    5.    At a Minimum This Court Must Conduct and Evidentiary
>           Hearing

Both the prosecution and Agent Chavez must realize that the comments attributed to him, in the article, are extremely prejudicial to Mr. Klimavicius' right to a fair trial. As detailed above, a great deal of information not presented in court, was contained in the article and attributed directly to Agent Chavez. Attempting to distance himself from such prejudicial comments, Agent Chavez has stated, through government counsel, that he never made most of the statements contained in the article. Due to the serious nature of these allegations, and the impact these statements may have had on Mr. Klimavicius' right to a fair trial, it is critical for

9

this Court to conduct an evidentiary hearing, where Art Golden and Errol Chavez are questioned, under oath. If, indeed, Agent Chavez did tie Jose Castrillon's arrest to the NATALY I, then why is he denying it now? The answer is obvious.

B.    THE INTRODUCTION OF EXTRANEOUS INFORMATION DURING JUROR DELIBERATIONS DENIED THE DEFENDANTS A FAIR TRIAL

    1.    At a Minimum, There Is A Reasonable Possibility That The Article Affected The Verdict

Jurors have a duty to consider only the evidence introduced at trial. Hughes v. Borg, 898 F.2d 695, 699 (9th Cir. 1990). There is a general presumption that the jury will follow a court's instructions faithfully and diligently. The defendant, however, is not required to prove that the jury was actually affected by the extraneous information, only that it could have been. United States v. Caro-Quintero, 769 F. Supp. 1564, 1574 (C.D.Cal 1991).

A defendant is entitled to a new trial when the jury obtains or considers evidence that was not introduced at trial, and there is a reasonable possibility that the extrinsic material could have affected the verdict. Caro-Quintero, 769 F. Supp. at 1574. To establish a reasonable possibility, a defendant need only show a direct and rational connection between the extraneous material and the prejudicial verdict, and that the extraneous material related directly to a material aspect of the case. United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir. 1981), cert. denied, 456 U.S. 962 (1982). In Caro-Quintero, the court found the necessary direct and rational connection between the extraneous information and the prejudicial verdict had been established by evidence that jurors read portions of a newspaper containing articles relevant to the trial. 769 F. Supp. at 1575.

Six of twelve jurors in the instant case admitted having seen the article in the San Diego Tribune entitled "**Colombian held in wake of '95 drug haul with San Diego link.**" Four jurors admitted having read the article. The article contained information regarding, among other things, the interrogation of the

defendants that had not been presented at trial. Unquestionably, jurors were subjected to extraneous material. The issue is whether there is a reasonable possibility the extraneous material affected the verdicts.

As discussed above, Agent Chavez' statements in the newspaper article unmistakably link the NATALY I and Mr. KLIMAVICIUS and his codefendants to Jose Castrillon, a known drug smuggler. Agent Chavez is quoted throughout the article regarding Castrillon's connection to the NATALY I and Castrillon's connection to the Cali cartel. The article also states that Agent Chavez disclosed that information developed in San Diego played a major role in the arrest of Castrillon. The article also discloses that Mr. KLIMAVICIUS and his codefendants were interrogated, but that "Chavez said he had not been involved in the interrogation of the 10 crew members of the NATALY I, and could not say whether they had shed much light on Castrillon."

The government presented no evidence at trial that Mr. KLIMAVICIUS or any of his codefendants had been interrogated. The article, on the other hand, revealed that the defendants had been interrogated and clearly suggested that these interrogations had led to Castrillon's arrest. The article informed the jurors that: (1) the defendants had been interrogated; (2) information developed in San Diego led to the arrest of Castrillon; and (3) that Agent Chavez could not say whether the defendants' interrogations had shed "much" light on Castrillon. The implication is obvious.

Furthermore, during the trial the jury learned that Mr. Klimavicius is from Cali, Columbia and was on-board the NATALY I on prior occasions. When this information is combined with the information contained in the newspaper article, a juror would be led directly to the improper conclusion that Mr. Klimavicius lives in Cali because he works for Jose Castrillon, a high ranking member of the Cali cartel, and that he has smuggled drugs in the past for Mr. Castrillon.

11

1      Additionally, the article also reinforced the testimony of DEA agent Sallie

2 Casto, who testified about the profile of a typical drug smuggling operation. Ms.

3 Casto testified regarding the drug cartel's use of large shipping vessels like the

4 NATALY I as a "mother ship" to distribute cocaine at sea to smaller vessels. The

5 article specifically notes that Castrillon is "accused of exporting tons of cocaine to

6 the United States, concealed upon yachts and fishing boats." The article also

7 discusses Castrillon's connection to the Cali cartel and his ownership of "at least

8 four other vessels that were allegedly involved in transporting cocaine." The

9 article thus serves to validate Ms. Casto's testimony in the eyes of the jury and

10 could have led to jurors placing greater weight than justified on her testimony.

11      It is totally irrelevant whether the statements in the article are accurate. A

12 defendant's right to a fair trial mandates that those involved in the prosecution of

13 the case, as was Errol Chavez, not discuss the case with the press, particularly

14 while the jury is deliberating. Since the jurors were exposed to extraneous

15 information at the very time when they were formulating conclusions as to the

16 guilt or innocence of the defendants, the article clearly could have affected those

17 conclusions. There is no question the jurors did not disregard the article, since

18 many of them admitted having read it, and one juror even disclosed that it was

19 discussed in the jury room. Given the circumstances, there is at least a reasonable

20 possibility that the verdict was impacted by extraneous information.

21     2.    The Jurors' Exposure To The Article Was Not Harmless Error

22      Once there has been a showing of a reasonable possibility that the

23 extraneous information affected the outcome, the burden shifts to the government

24 to show beyond a reasonable doubt that the extraneous information did not

25 contribute to the verdict. Caro-Quintero, 769 F. Supp. at 1573. The government

26 must show that any constitutional error was harmless beyond a reasonable doubt.

27 The government must demonstrate that either the material was merely duplicative

28 of evidence introduced at trial or the evidence presented at trial was so

overwhelming that the jury would have reached the same result, even without the extraneous material. Id at 1574. In Bayramoglu v. Estelle, 806 F.2d 880 (9th Cir. 1986), the Ninth Circuit considered five factors in determining whether the prosecution successfully rebutted the presumption of prejudice arising from the introduction of extraneous evidence. Those five factors are: (1) whether the material was actually received, and if so, how; (2) the length of time the material was available to the jury; (3) the extent to which the jurors discussed and considered it; (4) whether the material was introduced before a verdict was reached; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. Application of these factors to the instant case establish that the error cannot be considered harmless.

The material was received by the jurors via the Sunday edition of the San Diego Union-Tribune, the most widely circulated local paper. The article was prominently displayed on the back cover of the first section of the paper; it would only have been more noticeable if it had been on the front page. The jurors read the article over the weekend immediately preceding their second day of deliberations. The extent to which the jurors discussed and considered the information is unknown, although one juror admitted on the record that the article was discussed in the jury room. Further, the article did not merely reiterate information presented at trial. The government presented no evidence at trial that the NATALY I had been used for shipping drugs in the past, that there was any link between the defendants or the NATALY I and the Cali cartel, or that the defendants had been interrogated. All this information came to the jury, unchallenged by the defendants, via the newspaper article. Considering the prominence of the article, the crucial time at which it was released, the fact that it was discussed by the jurors, and its highly inflammatory nature, the government simply cannot rebut the allegation of a prejudiced verdict.

13

3.   The Court Erred In Not Conducting An Evidentiary Hearing Upon Learning Of A Possible Incident Of Juror Misconduct

Upon learning of a possible incident of juror misconduct, a trial court must hold an evidentiary hearing to determine the precise nature of the misconduct. Bagnariol, 665 F.2d at 885. In examining jurors to see if they were impacted by the extraneous material, the court is precluded from questioning them regarding the nature of the impact, but can inquire as to **whether** they discussed or saw the prejudicial evidence. United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979) (new trial granted where court file containing inadmissible evidence had been left in jury room for four hours during deliberations and jurors admitted to consulting it).

Federal Rule of Evidence 606(b) expressly prohibits federal courts from examining jurors about the **effect** of anything upon the jury's deliberations or specific juror's mental processes. See Bagnariol, 665 F.2d at 884 and Fed.R.Evid. 606(b). The rule reads as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the affect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict...except that a juror may testify as to whether extraneous prejudicial information was brought to the jury's attention or whether any outside influence was brought to bear on any juror.

In Mattox v. United States, 146 U.S. 140 (1892), the court found that the lower court had erred in allowing jurors to testify regarding the impact of a prejudicial newspaper article on their deliberations. The article had been published while jurors were in the midst of deliberations, and was read to them in the jury room. As in the instant case, certain jurors testified that the article had no impact whatsoever on their verdict. 146 U.S. at 144. The court found that while such statements were not admissible, affidavits substantiating that the article had been read by the jurors were allowable on the grounds that "they

14

tended to prove something which did not essentially inhere in the verdict, -an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one". 146 U.S. at 148.

More recently, in <u>United States v. Barragan-Cepeda</u>, 29 F.3d 1378, 1380 (9th Cir. 1994), the court again found that affidavits concerning extraneous influences on juror deliberations were admissible, except to the extent that they involved inquiry into the validity of the verdict. This plain-language reading of Fed.R.Evid. 606(b) has consistently been upheld by the court. <u>See, e.g.</u>, <u>United States v. Hernandez-Escarsega</u>, 886 F.2d 1560 (9th Cir. 1989) (juror's reliance upon sign from God in reaching verdict was not extraneous influence on verdict but intrinsic part of that juror's deliberations), <i>cert. denied</i>, 497 U.S. 1003 (1990) and <u>United States v. Griek</u>, 920 F.2d 840, 843 (11th Cir. 1991) (juror deliberations can not be exposed to public except by showing of outside influence).

In <u>United States v. Tanner</u>, 483 U.S. 107 (1987), the Court offers compelling reasoning for such close adherence to Fed.R.Evid. 606(b) by pointing out that if jurors could be questioned about how they reached a verdict, private deliberations would become the subject of incessant public inquiry. The integrity of the proceedings would be invaded by attempts to impeach verdicts through the admission of jury testimony. 483 U.S. at 107, (quoting <u>McDonald v. Pless</u>, 238 U.S. 264, 267-268 (1915)).

It is thus the court, not the jurors, who is in the best position to determine whether extraneous information affected the verdict. The <u>Vasquez</u> court noted that rather than rely on jurors' opinions of whether they were influenced by the extraneous information, the court should reach a judgment of reasonable probability of harm. 597 F.2d at 194; <u>see</u> <u>Henslee v. United States</u>, 246 F.2d 190 (5th Cir. 1957) (reversal of verdict in case involving prejudicial publicity though no juror admitted seeing the newspaper article at issue). If the court finds that even

one juror was prejudiced by the extraneous information, the defendant is entitled to a new trial. <u>Caro-Quintero,</u> 769 F. Supp. at 1574.

When the Court asked whether the article had been discussed during deliberations, one juror said that it had. Rather than hold a hearing to find out the extent to which the article had been discussed, the court simply asked the juror whether the article had affected her deliberations. As one would expect, she and all the other jurors denied that the article affected their deliberations and resulting verdict. The jurors obviously disobeyed court instructions by reading and then discussing extraneous materials. Given this fact, no juror in their right mind is going to admit that the article played a significant role in their consideration of the case. This is the very reason Fed.R.Evid. 606(b) precludes such an examination by the court. For this reason, the Court's examination of the jurors alone requires that a new trial be granted.

## III.

## CONCLUSION

For all the reasons discussed above, Mr. Klimavicius respectfully requests this Court grant his Motion for Mistrial and/or an evidentiary hearing, or, in the alternative, a New Trial.

Dated:   July 8, 1996              Respectfully submitted,

McKENNA & CUNEO, L.L.P.


By _____
                 Juanita R. Brooks
                 Attorneys for Defendant,
                 RICHARD KLIMAVICIUS-VILORIA

| UNITED STATES OF AMERICA, | U.S.D.C. NO. 95-1421 |
|---|---|
| Plaintiff, | DECLARATION OF SERVICE |
| vs. | Person served: See Item 4 below |
| RICHARD KLIMAVICIUS-VILORIA (1), et al. | Date served: 7-8-96 |
| Defendant. | |

I, the undersigned, declare under penalty of perjury that I am over the age of 18 years and not a party to the above-entitled action; that I served the above-named person the following documents:

**NOTICE OF MOTION AND MOTION FOR MISTRIAL BASED ON GOVERNMENT MISCONDUCT AND/OR AN EVIDENTIARY HEARING OR, IN THE ALTERNATIVE, A NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

1)____By personally delivering copies to the person served.

2)____By leaving copies, during usual office hours, in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3)____By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4)_X_By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at San Diego, California on July 8, 1996.

**See service list attached hereto**

Executed July 8, 1996, at San Diego, California.

Wendye Lyn Conn

Service List

Inge Brauer, Esq.                            Attorney for Defendant,
2240 F Street                                Felix Otero Estupinan
San Diego, California  92102

Telephone:  (619) 238-1031
Fax:          (619) 238-0930


Wayne D. Brechtel, Esq.                      Attorney for Defendant,
380 Stevens Avenue, Suite 211                Freddy Queney Rivas Lerma
Solana Beach, California  92075

Telephone:  (619) 792-4688
Fax:          (619) 792-4680


Douglas C. Brown, Esq.                       Attorney for Defendant,
501 West Broadway, Suite 800                 Daniel Payan Solis
San Diego, California  92101

Telephone:  (619) 230-7254
Fax:          (619) 231-9754


James Matthew Brown, Esq.                    Attorney for Defendant,
Law Offices of James Matthew Brown           Ruben Dario Palma Robayo
710 West Ivy
San Diego, California  92101

Telephone:  (619) 238-0815
Fax:          (619) 233-4516


William R. Burgener, Esq.                    Attorney for Defendant,
3990 Old Town Avenue, Suite 103A             Arnulfo Rojas Renteria
San Diego, California  92110

Telephone:  (619) 291-8565
Fax:          (619) 543-0824

United States v. Klimavicius, et al.
U.S. District Court Case No. 95-2359-M

Service List - Continued

Michael S. Burke, Esq.  
105 West F Street  
Fourth Floor  
San Diego, California 92101

Attorney for Defendant,  
Oscar Caicedo Pineda

Telephone:  (619) 234-2503  
Fax:  (619) 234-2529

Robert Corriedo, Esq.  
105 West F Street, Suite 203  
San Diego, California  92101-6036

Attorney for Defendant,  
Dagoberto Lerma

Telephone:  (619) 232-0900  
Fax:  (619) 238-9914

Daniel Casillas, Esq.  
2655 Camino del Rio North, Suite 208  
San Diego, California  92108

Attorney for Defendant,  
Edilberto Ferraro Montesdeola

Telephone:  (619) 298-8700  
Fax:  (619) 297-0755

Mark A. Chambers, Esq.  
1020 S. Santa Fe, Suite E  
Vista, California  92084

Attorney for Defendant,  
Leoncio Alberto Morcillo Vidal

Telephone:  (619) 758-4180

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.D.C. NO. 95-1421 |
| Plaintiff, | DECLARATION OF SERVICE |
| vs. | Person served: |
| | WILLIAM V. GALLO, Asst. U.S. Attorney, |
| RICHARD KLIMAVICIUS-VILORIA (1), | and |
| et al. | GONZALO CURIEL, Asst. U.S. Attorney |
| Defendant. | |
| | Date served:  7-8-96 |

I, the undersigned, declare under penalty of perjury that I am over the age of 18 years and not a party to the above-entitled action; that I served the above-named person the following documents:

**NOTICE OF MOTION AND MOTION FOR MISTRIAL BASED ON GOVERNMENT MISCONDUCT AND/OR AN EVIDENTIARY HEARING OR, IN THE ALTERNATIVE, A NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

1) X   By personally delivering copies to the person served.

2)____By leaving copies, during usual office hours, in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3)____By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4)____By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at San Diego, California on July 8, 1996.

Executed July 8, 1996, at San Diego, California.